**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CYNTHIA ORIENTI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11 C 7724** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Cynthia Orienti seeks review of the final decision of the Commissioner of the Social Security

Administration, denying her application for Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act ("Act"), 42 U.S.C. § 403(d)(2), and Supplemental Security Income ("SSI")

under Title XVI of the Act 42 U.S.C. § 1382c(a)(3)(A). Ms. Orienti asks the court to reverse and

remand the Commissioner's decision or for additional proceedings. The Commissioner seeks an

order affirming the decision.

## I.
## PROCEDURAL HISTORY OF THE CASE

Ms. Orienti applied for Disability Insurance Benefits and Supplemental Security Income on

January 30, 2007, alleging a disability onset date of May 9, 2003 (Administrative Record ("R.") 57).

Her claims were initially denied on May 4, 2007, and again, upon reconsideration, on July 2, 2007.

(R. 75, 81). Ms. Orienti then requested an administrative hearing. ( R. 89). An Administrative Law

Judge ("ALJ") presided over the hearing on January 12, 2009, at which Ms. Orienti, represented by

counsel, appeared and testified. (R. 31). On April 14, 2009, the ALJ issued a decision that denied

Ms. Orienti's claims. (R. 64). Ms. Orienti then requested review by the Appeals Council, which was

denied on January 6, 2011. (R. 72). Ms. Orienti has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Ms. Orienti was born on November 27, 1956 and was 52-years-old on the date that the ALJ issued his decision. (R. 57). She is divorced with no children and lives with her mother. (R. 34). Ms. Orienti first said she stopped working at UPS due to fumes from the trucks. (R. 35). She added that she later injured her wrist while working and was then laid off. *Id.* Her previous positions include waitress, telephone solicitor, and order clerk. (R. 51-52). She has not worked since 2007. (R. 244).

### B.
### The Medical Evidence

There is only a thin record of medical evidence in the record. Three emergency room visits and a consultative examination make up the bulk of medical evidence that Ms. Orienti put forward to substantiate her claim. Ms. Orienti's first emergency room visit in the record is on February 15, 2006 at Westlake Hospital where she complained of shortness of breath. (R. 261). The report showed chest congestion consistent with cold symptoms and acute bronchitis, but she had clear lungs and a 97% oxygen saturation rate. (R. 287). She left before being seen by a doctor.

On February 21, 2006, Ms. Orienti was examined at the Access Alma Comp Medical Center. (R. 271). Those medical records confirm a diagnosis of acute bronchitis and mention bilateral expiratory wheezing. (R. 275). Everything else about the exam returned normal results and there was no evidence of any complaint or any finding of mental health issues. *Id.* Ms. Orienti's weight was

recorded at 180 lbs. (R. 274). The notes also state that Ms. Orienti was a smoker at the time. (R. 273).

Following this exam, on March 8, 2006, Ms. Orienti returned to the clinic complaining of headaches. However, before any detailed examination or treatment was documented, Ms. Orienti left and told doctors that she would return but never did. (R. 271). At these examinations at Westlake and Access Alma, her only two episodes of hospital visits from 1992 to 2006, Ms. Orienti made no claims of any mental or psychological illness or impairment.

An April 16, 2007 consultative evaluation by Dr. Sandra Hare, M.D. returned normal lung function results, with the exception of some coughing and wheezing during the examination. (R. 48). At that exam Ms. Orienti said that she had not used her inhaler for the past six months. (R. 276). The report noted Ms. Orienti's claim of an unknown left wrist surgery in 2006 and a 2012 right wrist injury in a motor vehicle accident. (R. 277). However, Ms. Orienti demonstrated normal fine and gross motor skills, finger grasp and hand grip was 5/5 bilaterally, and she had a full range of motion of all joints. (R. 278).

Ms. Orienti also alleged that she was vomiting "*every time she eats.*" But oddly, she denied any weight loss and weighed 186 lbs. (R. 277)(emphasis supplied). She also denied any history of drug use and any allergies. (R. 276-77). She denied any psychiatric hospitalization, and Dr. Hare noted that Ms. Orienti was "alert and oriented," she had normal hygiene, "[h]er recent and remote memory was intact," and she "had a serious, polite, and sincere demeanor." (R. 279).

On May 3, 2007, Dr. Towfig Arjmand, M.D. performed a Physical Residual Functional Capacity ("RFC") Assessment on Ms. Orienti. Dr. Arjmand determined that there was no medical evidence to verify Ms. Orienti's claim that she had contracted hepatitis-C. Dr. Arjmand also reported

that the "severity and duration of the symptoms were disproportionate to the expected severity or expected duration" of her medically determinable impairments of asthma and hepatitis-C. (R. 285). Ms. Orienti requested a re-examination but failed to show up for the appointment. (R. 290).

In a final emergency room visit to Stroger Hospital on August 16, 2007, Ms. Orienti was diagnosed with an exacerbation of her COPD and dyspepsia. (R. 295). Her symptoms included abdominal pain and vomiting blood. (R. 292). However, the medical record shows regular and clear breathing, with no rales, rhonchi, or wheezing. *Id.* She was instructed to contact her primary care physician for an appointment. *Id.* There is no evidence on the record of any follow up appointment.

It is not until a series of records documenting three visits to the DuPage Community Clinic from October 23, 2008, to November 4, 2008 – well after she applied for benefits and shortly after she hired counsel – that Ms. Orienti's complaints of various mental health symptoms appeared. (R. 298-99, 310). The documents contained no diagnosis or record of treatment and, despite her earlier claims, Ms. Orienti admitted to abusing marijuana until only four months prior. (R.310). She also stated that she used crack until two to three years prior and had been arrested for selling to an undercover cop in 1989. *Id.* She weighed 184 lbs. at the time of the exam. It is at this point, about two months before her administrative hearing, that Ms. Orienti first told a medical professional about her feelings of paranoia, past suicide attempt, and struggles with depression and autism and personality disorders as a child. (R. 310).

On November 6, 2008, Ms. Orienti underwent a Pulmonary Function Test ("PFT") to assess her lung function with respect to her allegation of COPD. (R. 306). Her performance of the activities necessary for the test did not meet the minimum criteria necessary to provide valid test results. *Id.*

**C.**

**The Administrative Hearing Testimony**

**1.**

**Ms. Orienti's Testimony**

Despite the thin record of medical treatment and diagnoses, which do not support Ms. Orienti's present claim, she attributed several medical conditions as the causes of her current symptoms. She testified that she had experienced difficulty breathing due to asthma since she was four years old and been diagnosed with chronic obstructive pulmonary disease ("COPD"). (R. 276). According to Ms. Orienti, her breathing problems had become so bad that she had problems breathing even when she was just lying in bed and she coughed and choked a lot. (R. 38).

Ms. Orienti asserted that she suffered from hepatitis-C, but she did not know how she contracted the disease and denied any activities where she might have been exposed to the virus. (R. 276). She testified that she was unable to hold food down due to the condition. (R. 227). In fact, she claimed she vomited "every time she ate. (R. 277).

At her administrative hearing, Ms. Orienti testified that she began having problems at her last job unloading packages from trucks. (R. 35). She stated that she kept losing her breath, and the fumes from the trucks made it difficult for her to breathe. (R. 35). According to her testimony, she also injured her left wrist, was laid off, and needed surgery to repair torn ligaments. (R. 35-36).

Ms. Orienti also testified that she had knee surgery following a fall. (R. 44). She stated that she was often in pain and had trouble walking and lying down because of pain in her knee. *Id.* She claimed that she could only climb 6 or 7 stairs because of stiffness in her ankles. (R. 203).

She also stated that she had surgery on both wrists and that she suffered from arthritis in both of her wrists and her knee. (R. 202, 243). According to Ms. Orienti, the right wrist surgery dated

5

back to a 1992 motor vehicle accident. (R. 277).

While she testified that she was a smoker for 30 years, her testimony at her hearing was in conflict with her prior statements to doctors about how long ago she recently stopped smoking. (R. 276). She said she was unable to remember exactly when she stopped smoking, and when the ALJ questioned her about discrepancies in her responses in the record she responded, "[m]aybe about two years ago." (R. 37). She also indicated that she had not used crack since 2005 or 2006. *Id.* She testified that she was on disability from 1991-1997 for abusing marijuana and a "severe personality disorder." (R. 37-38). However, this testimony is at odds with her previous statement to the DuPage Community Clinic that she received benefits from 1987-1991 due to an autism diagnosis. (R. 310).

After her initial application for DIB and SSI, in a subsequent medical examination, Ms. Orienti claimed that she was depressed. (R. 308). She traced the condition back to her fiancé's murder in 2000. *Id.* She also testified that she was undergoing psychiatric treatment for depression. (R. 38-39). She stated that she was unable to interact with others, even fighting with her adopted mother whom she lived with, and only felt safe in her room. (R. 39, 41).

Her testimony described how she was only able to fall asleep at 6:00 or 7:00 in the morning because she has a fear of "someone doing something to her" and she had to listen for "things." (R. 41-42). She suggested that her fiancé's murder in 2000 contributed to these feelings. (R. 42). She claimed that she had trouble focusing on things and described how she cannot read a book or watch television because she cannot focus on one thing at a time. (R. 42). A public employee assigned to Ms. Orienti's mother visited the home twice a week to do all of the household activities. (R. 43).

According to her testimony, in 2008 she began seeing a psychologist weekly for several months and had been referred to a psychiatrist whom she had seen for the first time several days

before the hearing. (R. 40). However, from her fiancé's death in 2000 until 2008 she did not seek any psychiatric counseling and did not produce any documentation of any current treatment. (R. 45).

She acknowledged that she had a "low income medical" card with the Du Page Community Clinic for her healthcare. (R. 45).

## 2.
## The Medical Expert's Testimony

Dr. Bernard Stevens, M.D. testified as a medical expert ("ME") at Ms. Orienti's hearing. (R. 46). Dr. Stevens confirmed that she did suffer from asthma but he could not conclusively determine whether she had COPD. (R. 47-48). According to the ME, the ambiguity in diagnosing the COPD was a result of a lack of "full cooperation" during her PFT. *Id.* The test was deemed not valid because Ms. Orienti's performance failed to meet the testing criteria. (R. 307).

In his testimony, Dr. Stevens found that the lack of consistent hospital stays or emergency room visits indicated that the condition was "not that severe." (R. 48). Based on her record of asthma, according to Dr. Stevens' testimony, Ms. Orienti would require occupational restrictions for atmospheric pollutants, temperature extremes, and humidity, but not any exertional limitations. *Id.*

Dr. Stevens also noted that Ms. Orienti's blood chemistry revealed normal albumin levels, indicating that if she does have viral hepatitis that it has not progressed to cirrhosis. (R. 49). The record did not contain detail about any surgery or injury to Ms. Orienti's wrists or knee so Dr. Stevens was unable to reach any conclusions about these conditions. (R. 47). Overall, he found that Ms. Orienti's impairments did not meet or equal a listing of recognized impairments. (R. 47). *See* 20 C.F.R. § 404.1520(d).

### 3.
### The Vocational Expert's Testimony

The vocational expert, Mr. Thomas Guslav, testified that Ms. Orienti's work as a phone solicitor was rated as a sedentary-demand position by the Dictionary of Occupational Titles, with an SVP: 3, semiskilled. (R. 53). Her next job as a waitress qualified as a light demand position, again with an SVP: 3, semiskilled. *Id.* Her other job as an order clerk was also a sedentary demand position with an SVP: 4, semiskilled. *Id.* He also testified that limitations to avoid concentrated exposure to pollutants, temperature extremes, and humidity would have no impact on any of these jobs. *Id.* Additionally, the limitation would allow for "many other types of jobs." *Id.*

When questioned by Ms. Orienti's attorney, Mr. Guslav testified that if a person was "off task" for 20 percent of the day such a situation would rule out "all employment." (R. 53-54). He responded to another of Ms. Orienti's attorney's questions that if she needed to take as little as one unscheduled ten to fifteen minute break during the day "either due to psychiatrically-based symptoms, or to asthma attacks and coughing fits," that she would be excluded from "most employment opportunities." (R. 52).

In response to further questioning by Ms. Orienti's attorney, Mr. Guslav testified that the necessity of supplemental instruction and supervision to leave a new job would be considered a "special accommodation." (R. 54-55).

### III.
### THE ALJ'S DECISION

The ALJ found that Ms. Orienti met the insured status requirements of the Social Security Act through March 30, 2011 and that she had not engaged in substantial gainful activity since May, 9, 2003, the alleged disability onset date. (R. 66). He found two severe impairments: asthma/COPD

and viral hepatitis. (R.66) *citing* 20 C.F.R. § 404.1520(c) and 416.920(c). In assessing these impairments, the ALJ noted Ms. Orienti's 31 years of smoking and the instances of treatment for shortness of breath noted in the record. (R. 66). He also pointed out that, despite crediting it as a severe impairment, Ms. Orienti has never been treated for hepatitis-C related symptoms and that there are no test results to confirm her claim. (R. 66). He noted Dr. Stevens' finding that even if it were assumed that Ms. Orienti has viral hepatitis, it has not progressed to cirrhosis. (R. 66-67).

Regarding Ms. Orienti's knee and ankle pain, the ALJ noted that there was no radiographic or imaging evidence to document her claim of prior knee surgery or condition. (R. 67). Additionally, he noted the April 2007 consultative examination that showed full range of motion and normal fine and gross motor skills. *Id.* He determined that since arthritis is not a medically determinable impairment that it cannot be considered "severe" under the Social Security Act. *Id.*

Next, the ALJ found that Ms. Orienti does not have an impairment or combination of impairments that meets or medically equals the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* In so doing, he looked to the opinions of the state medical consultants and the medical expert at the hearing, all of whom agreed that Ms. Orienti's impairments did not meet the specific criteria of the Listings. *Id.*

The ALJ then found that Ms. Orienti had the residual functional capacity to perform a full range of work at all exertional levels with nonexertional limitations on concentrated exposure to dust, fumes, odors, gases, poor ventilation, and temperature and humidity extremes. *Id.* He asserted that, in making this determination, he considered all symptoms and whether they were "reasonably consistent with the objective medical evidence . . . ." *Id. See* 20 C.F.R. §§ 404.1527, 416.927 *and* SSR 96-2p, 96-5p, 96-6p, 06-3p.

After briefly summarizing Ms. Orienti's testimony about her symptoms, the ALJ determined that "the medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.*

In reaching this conclusion, the ALJ found that Ms. Orienti's treatment and medication history were not consistent with her claims of impairment. *Id.* He pointed out the 2006 emergency room visit that showed congested lungs but otherwise normal results, along with her inconsistent statements about when she quit smoking. *Id.* He also highlighted her failure to return to the Alma Comp Medical Center in March 2006 for a follow up appointment concerning her lungs. *Id.* He additionally noted the April 2007 consultative appointment that also showed virtually normal lung function even though Ms. Orienti had not been taking her inhaler for the prior six months. *Id.* He also pointed out that in August 2007 she failed to follow up with her primary care physician following an emergency room visit at Stroger Hospital, despite the availability of free care at that facility. *Id.*

With regards to her claims of mental disability, the ALJ noted that Ms. Orienti had never sought or received any mental health treatment. (R. 69). The only treatment records of mental illness came from an initial interview at the DuPage Community Clinic in October 2008. *Id.* In that interview she stated that she was still smoking, which the ALJ pointed out was again inconsistent with the testimony she gave at her hearing. *Id.*

The ALJ stated that no further medical evidence was submitted after the hearing to back up these claims even though he left the record open for one month following Ms. Orienti's hearing. *Id.*

In assessing the credibility of Ms. Orienti's many statements that were not backed up by medical evidence, the ALJ looked to the inconsistent level and frequency of treatment that would otherwise be suggested by her alleged symptoms. *Id.* He pointed out that she had maintained a consistent weight of about 186 lbs. for the prior two years. *Id.* He did, however, credit Ms. Orienti's claims of breathing difficulties, in view of her long history of smoking, even though the condition appeared to be "essentially untreated." *Id.* Nevertheless, he pointed out that the nonexertional restrictions adopted in his decision accommodated this restriction. *Id.*

The ALJ supported his RFC analysis with the opinions of the physicians employed by the State Disability Determination Services, even though they had not examined Ms. Orienti. *Id.* He stated that their opinion carries more weight in a case like this one where there are a number of other reasons to reach similar conclusions. (R. 69-70). Similarly, the ALJ alluded to Dr. Stevens' testimony about the lack of emergency room visits and hospital stays and his agreement with the state's RFC analysis. (R. 70).

He explained that he declined to order another PFT because he found that Ms. Orienti did not meet the testing performance criteria only two months prior as a consequence of her "poor effort," and thus there was no reason to expect additional testing to be more effective. (R. 70).

Lastly, the ALJ found that Ms. Orienti was capable of performing her past relevant work as a telephone solicitor, order clerk, or waitress because the work does not require any work-related activities restricted by her RFC. *Id.* He summarized the Vocational Expert's testimony that the RFC determined in the decision would allow for Ms. Orienti's prior work, as well as "a host of other jobs . . . that such an individual could perform." *Id.*

# IV.
# DISCUSSION

## A.
## The Standard of Review

We review the ALJ's decision deferentially and will not reweigh evidence or replace the ALJ's judgment with our own. *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). Our analysis focuses on whether the ALJ's determination was supported by substantial evidence, comprising "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). The ALJ must provide "an accurate logical bridge" from the evidence to his conclusion that the claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642 (7th Cir. 2012). It is a "lax" standard. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). It is enough if the ALJ "'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of disability.'" *Id.*; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001).

## B.
## The Logical Bridge Requirement

As occurs so often where catch phrases are involved, the term, "logical bridge" has taken on a life of its own as though it were some self-defining and exacting test, which requires that an ALJ's decision be viewed grudgingly. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing—phrases which originally were contributions, but which, by their very felicity, delay further analysis...." Holmes, *Law and Science and Science and Law,* 12 Harv. L. Rev. 443, 455 (1899). Judge Posner, who coined the phrase in *Sarchet,* would be the first to acknowledge that it was not meant as a formula. *Compare, e.g., United States v.*

*Edwards,* 581 F.3d 604, 608 (7th Cir.2009)( "We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004).

The point Judge Posner sought to make in *Sarchet* was that unexplained conclusions by Administrative Law Judges, no less than by federal judges, are not persuasive and preclude meaningful appellate review – a point that had been made years earlier in *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994), on which *Sarchet* relied. In *Herron*, the court said: "Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some *minimal* level his analysis of the evidence.'" *Id.* at 333–334 (citations omitted)emphasis added).

Thus, it is plain that the"logical bridge" requirement is not about *elegantia juris*. The ALJ need not build the Pont Neuf. A simple trestle will suffice so long as it allows the reviewing judge to traverse the divide between the evidence and the conclusions. The ALJ's explanations in this case do that and more.

## C.
## The Five-Step Sequential Analysis

Section 423(d)(1) of the Act defines disability as an "inability to engage in any substantial gainful activity be reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential analysis to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; Stein v. Sullivan, 892 F.2d 43, 44 (7th Cir.1989). The burden of proof is with the claimant through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

## D.
## Analysis

## 1.

Ms. Orienti's first contention is that the ALJ did not properly employ the "special technique" described in 20 C.F.R. § 404.1520a for evaluating a claimant's alleged mental impairment. According to her, the ALJ did not adequately evaluate her symptoms and her visit to the DuPage Community Clinic in November 2008. The first step of the special technique requires an evaluation of the "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable impairment. 20 C.F.R. § 404.1520a(b). Only if the ALJ determines that the claimant has a medically determinable impairment does he "specify the symptoms, signs, and

14

laboratory findings that substantiate the presence of the impairment(s) and document [his] findings . . . ." *Id.*

Previous cases where ALJ decisions have been overturned for failure to use the special technique have involved claimants with a documented history of mental illness leading to an initial finding by the ALJ of the presence of a mental impairment. *See, e.g. Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008)(failure to use the special technique is not harmless when ALJ has already determined that mental impairments are "severe") *and Richards v. Astrue*, 370 Fed.Appx. 727 (7th Cir. 2010) (when claimant had a history of mental illness and a psychiatrist's diagnosis of depression, it was error to fail to incorporate expert opinion into a special technique analysis).

Here, the ALJ did not have to complete the special technique because he reasonably found that Ms. Orienti failed to establish a medically determinable mental impairment at the first step. Ms. Orienti had neither a recent history of depression nor a physician's diagnosis. In his decision, the ALJ made note that Ms. Orienti has "never sought or received any mental health treatment." (R. 69). While she asserted in her testimony that she had been receiving regular care for the 2 months prior to the hearing, neither she nor her counsel was able to present any records of treatment, even though the ALJ left the record open for an ample period after the hearing.

That, of course, did not bode well for a favorable assessment's of the plaintiff's credibility on this issue. The rule is that, if a party has it peculiarly within his power to produce witnesses or documents that would elucidate the transaction, the fact that she does not do so permits the inference that the evidence does not exist or that if it does, it would not be favorable. *Graves v. United States*, 150 U.S. 118, 121 (1893); *Miksis v. Howard,* 106 F.3d 754, 763 (7th Cir.1997); *United States v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976).

The only piece of evidence that even remotely suggests a mental impairment is the DuPage Community Clinic records from November 2008 – a mere two months before Ms. Orienti's hearing and just a few months after she retained counsel. (R. 101-05). Out of the ten years of medical records that Ms. Orienti submitted to the ALJ, it is only at this point that she comes forward with a litany of mental impairments: she suddenly claimed an inability to function normally, fear of leaving her room, and anxiety around people. (R. 308). She wove a narrative of a troubled childhood where she ran away from home to escape an emotionally abusive mother. (R. 309). For the first time, she said she was homeless until a series of failed and traumatic relationships. *Id.* She mentioned a suicide attempt, her history of cutting herself, a prior diagnosis or autism and a personality disorder and traced her condition back to her fiancé's murder in 2000 – all details that had not made it into any medical record in the past ten years or caused her to seek any counseling or treatment. (R. 310). The form documenting her story was not even signed by a doctor and contains no objective medical opinion as to her condition. *Id.*

In order to show an impairment, the claimant must establish their condition with "medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. *See also* 20 C.F.R. § 404.1527. Signs require "observable facts that can be medically described and evaluated." *Id.* The DuPage record is devoid of medical observation, description, and evaluation," and it does not show "signs," and certainly not "laboratory findings." *See* 20 C.F.R. § 404.1528. Like her testimony at her hearing, the record contains only Ms. Orienti's descriptions of her symptoms. Such evidence is not enough to establish a mental impairment. 20 C.F.R. §§ 404.1508, 404.1528. Therefore, the ALJ had no duty to move to the second step of the special technique, and did not err by failing to do so.

**2.**

Ms. Orienti also claims that the ALJ failed to gather enough information to properly adjudicate her claim of mental impairment. ALJs have a "duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). However, review of an ALJ's decision to not order further medical testing should be deferential to the ALJ. *Wilcox v. Astrue*, 492 Fed.Appx. 674, 678 (7th Cir. 2012). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

Here, despite her sudden allegations of a long history of psychological impairments, there is no medical opinion evidence that Ms. Orienti suffers from any mental impairment, only Ms. Orienti's summary of her claimed symptoms. These symptoms were not voiced to any medical professional by Ms. Orienti until two months prior to her hearing. And her lawyer never claimed there were any prior complaints and offered no evidence that there were prior complaints.

Given what occurred in this case, the ALJ did not fail to fulfill his duty to develop the record. Indeed, he left the record open for submission of medical evidence that Ms. Orienti testified she already had, thereby giving her and her attorney ample opportunity to supplement the record with information that was uniquely and exclusively available to her. (R. 40). Yet, tellingly, neither she nor her lawyer submitted anything further or asked for additional time to make such a submission. *Compare Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir.2009)(Nelms filed, in this court, a separate appendix of medical records from 2003, 2004, and 2005 for the limited purpose of demonstrating prejudice. That appendix contains various examination reports and diagnoses from the same

Wisconsin hospital where Nelms had his surgery. The documents, moreover, support Nelms's theory that the ALJ likely would have found Nelms disabled had he considered them).

If Ms. Orienti were seeing a psychologist on a weekly basis as she testified (R.40), it is a reasonable inference that there would have been some treatment notes (or their equivalent) that could have been submitted to the ALJ either prior to the hearing or in the extended period that the ALJ left open following the hearing. Yet, all that exists in the record is a report of a single, brief, initial interview with no diagnosis or evaluation. *See supra* at 15-16; *Metzger v. Astrue,* 263 Fed.Appx. 529, 533 (7th Cir. 2008)("The ALJ here adequately explained her reasons for not finding Metzger credible, stating that his physicians' reports did not corroborate that he was experiencing the level of difficulty he described in connection with his claim for benefits. For example, Metzger complained of neck pain during his consultative examination with Dr. Saini, but a week later, visiting Dr. Saini again as a treating physician, he did not report neck pain and Dr. Saini found his neck to be 'supple.'").

In *Barnett*, which Ms. Orienti relies on, the ALJ disregarded a physician's opinion about the existence of an impairment, not an unsupported assertion by the claimant. *Id.* The court cited 20 C.F.R. § 404.1527(c)(3), which describes the process by which ALJs determine the supportability of a "medical source." Here there is no medical source, and there is sufficient evidence to support the ALJ's decision.

**3.**

Ms. Orienti, quite surprisingly, objects to the ALJ's credibility finding that she "made statements that are not substantiated by the record." (R. 69). When weighing the scanty record of medical treatment, the medical evaluations in the record, and Ms. Orienti's numerous and

unsupported and inconsistent descriptions of her varied symptoms, and the absence of complaints until the eve of the hearing, the ALJ understandably was perplexed as to how the "alleged functional limitations and restrictions due to symptoms . . . c[ould] reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). In making this determination, the ALJ was required to make a credibility assessment in order to find whether Ms. Orienti's claims could be accepted in light of the objective medical information in the record.

Time and again, the Seventh Circuit has reminded the lower courts that they are not to substitute their judgments for that of the ALJ on issues of credibility since the ALJ was in a far better position to make the credibility judgment. What Justice Cardozo said about [s]ubstitut[ing] statute for decision," applies equally to the repeated efforts of litigants to shift the responsibility for ultimate credibility judgments from the ALJ to the reviewing court: "you shift the center of authority, but add no quota of inspired wisdom." Cardozo, The Growth Of The Law 133 (1924). Thus, the undeviating rule to be applied in reviewing an ALJ's credibility determination is that review is deferential. *Schaaf,* 602 F.3d at 875; *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir.2009). We look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported, and we "'give the opinion a commonsensical reading rather than nitpicking at it' Accordingly, we will overturn the ALJ's credibility determinations only if they are 'patently wrong.'" *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010).

Here, the ALJ's determinations were not patently wrong, and his reasons for discrediting testimony were neither unreasonable nor unsupported. He quite properly rejected portions of the claimant's testimony, no doubt recognizing that applicants for disability benefits have an incentive

to exaggerate their symptoms. *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006).[1] Here, the ALJ could properly find that Ms. Orienti's claims went beyond exaggeration, and he was free to discount certain aspects of her testimony on the basis of the other evidence in the case as well.

In general, many of Ms. Orienti's statements were glaringly inconsistent and implausible. She alleged constant chronic and significant digestive problems, claiming she vomited after every meal, but had no weight loss or complaints of other symptoms. (R. 271, 279, 299). While an ALJ cannot merely ignore claims if they are supported by medical findings or signs, *Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001), the ALJ may find a claimant's symptoms not credible even where there is a medically determinable impairment that could reasonably be expected to produce the complained-of symptoms. *See Scheck v. Barnhart,* 357 F.3d 697, 701-03 (7th Cir. 2004).

While not as incredible as her claims of vomiting "after every meal" with no weight loss – and even a slight weight gain – her statements about when she quit smoking changed with almost every inquiry, and her story of her previous time on disability benefits was inconsistent as well. (R. 37). Inconsistencies like these detract from credibility. *See Hamilton v. Colvin*, 2013 WL 1855725 *4 (7th Cir. 2013)("Testimonial inconsistencies can indeed form the basis of an adverse credibility finding (citing SSR 96–7p)); *Wurst v. Colvin*, 2013 WL 1501941, 2 (7th Cir. 2013)("Of course, lies and inconsistent statements provide a valid basis for finding a witness not credible."); *Henke v. Astrue,* 498 Fed.Appx. 636, 640, 2012 WL 6644201, 3 (7th Cir.2012); *Long–Gang Lin v. Holder*, 630 F.3d 536, 544 (7th Cir. 2010); *Hill v. Astrue*, 295 Fed.Appx. 77, 81 (7th Cir. 2008).[2]

---

[1] *Cf. Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir. 2009) (every judge is aware that many people will lie in a trial when it is to their advantage).

[2] While the ALJ was charitable by not addressing this issue, Ms. Orienti also denied a history drug use on multiple occasions when she had in fact used both crack and marijuana. (R. 277, 310). Similarly, the ALJ

(continued...)

**4.**

Ms. Orienti objects to the "boilerplate" language used by the ALJ concerning the intensity, persistence and limiting effects of symptoms being not credible to the extent they are inconsistent with the residual functional capacity assessment. The Seventh Circuit, noting its frequent use by ALJs in their decisions, has repeatedly, but to no avail, criticized this template as "unhelpful." *Shauger v. Astrue,* 675 F.3d 690, 696–97 (7th Cir. 2012), "opaque," *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir. 2012), and "meaningless," *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir. 2010); *Martinez v. Astrue,* 630 F.3d 693, 694 (7th Cir. 2011).

The court has explained that this formula backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson,* 671 F.3d at 645–46. Similarly, merely saying that a plaintiff's statements are not generally credible  fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony. *See Spiva v. Astrue,* 628 F.3d 346 (7th Cir. 2010); *Parker,* 597 F.3d 920.

While these sorts of boilerplate statements are inadequate, *by themselves,* to support a credibility finding, *Richison v. Astrue,* 2012 WL 377674, *3 (7th Cir. 2012), their use does not make a credibility determination invalid. *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue,* 688 F.3d 306, 311–12 (7th Cir. 2012). Not supporting a credibility determination with explanation and evidence from the record does. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir. 2011); *Parker,* 597 F.3d at 921–22.

---

[2](...continued)
overlooked the fact that Ms. Orienti also testified that her knee pain was aggravated by her inability to take ibuprofen due to allergies, even though she reported no allergies at her consultative exam. (R. 44, 276). While these issues do not factor into the present analysis, they certainly would were the case to be remanded.

One wonders why arguments like the one advanced by Ms. Orienti continue to be included in briefs where, as here, the ALJ provides adequate reasoning beyond the repetition of the boilerplate phrase. Time and again lawyers are warned about the imprudence of including baseless arguments and the adverse effect it has on the balance of the brief. For example, in *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001), the court said: "The attorneys for the defendants must think that the more issues they raise, the greater their chance of success. ... They have displayed no judgment about what is a good argument and what is a bad argument." The Seventh Circuit has been tireless in warning lawyers about the folly of including baseless arguments in briefs since they actually detract from the presentation. *See, e.g., Walker v. Abbott Laboratories*, 416 F.3d 641, 643 (7th Cir.2005); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir.2006); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993). "[S]electivity [is]... a virtue....; ...concentration on the best arguments normally permits better development than is possible with a scattershot approach." *Pitsonbarger v. Gramley,* 141 F.3d 728, 734 (7th Cir. 1998).

The point to be made is that the continued, reflexive inclusion of the argument advanced by Ms. Orienti that the use of the boilerplate terminology by ALJs warrants reversal does not advance a claimant's case in the slightest. Indeed, the "boilerplate argument" – without more discerning analysis – is, itself, meaningless boilerplate. Often – as was the case here – a brief will set out the canned boilerplate argument – arguing, in essence, that the ALJ failed to provide any rationale for his or her credibility determination – even though there is a careful rationale which the claimant's brief unwittingly refers to or wittingly ignores.[3]

---

[3] This approach is unacceptable and needlessly squanders the time of the judge, who has to respond to the baseless argument. In fact, inclusion of arguments in briefs that have no reasonable basis in law or fact are potentially sanctionable. Fed.R.Civ.P. 11(b); *Fabriko Acquisition Corp. v. Prokos,* 536 F.3d 605, 610 (7th

(continued...)

**5.**

Failures to seek medical treatment in the face of claimed illness, can be a factor in evaluating credibility. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Schaaf*, 602 F.3d at 876. The ALJ in this case properly considered the plaintiff's history or lack thereof of seeking medical care and her statements to the doctors she did see.

Ms. Orienti objects to the ALJ's reasoning by arguing that the ALJ should not have been able to draw a negative conclusion about the credibility of her testimony regarding the presence and severity of her conditions from her sparse record of medical treatment and medication without considering her psychiatric, physical, and economic limitations that might prevent her from seeking care. An ALJ is entitled to look to the record, or lack thereof, in determining an individual's credibility. "[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration." *Sienkiewicz*, 409 F.3d at 804; *Powers v. Apfel*, 207 F.3d 431, 435–36 (7th Cir. 2000).

An ALJ also must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7P, 1996 WL 374186, at *7. ALJs have a duty to consider factors like inability to travel, mental illness, or economic constraints that may have prevented claimants from seeking receiving medical care. *See Godbey v. Apfel*, 238 F.3d 803, 809 (7th Cir. 2000); *McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010).

---

[3](...continued)
Cir.2008).  When an ALJ provides reasons for disbelieving a claimants testimony, plaintiff's counsel may argue that those reasons are invalid, but the "boilerplate argument" has no basis in fact or law and is a certain loser that does not help the client's case one bit.

While the ALJ did ask Ms. Orienti at her hearing if she could obtain free care at Stroger Hospital, and alluded to this fact in his decision, she now contends in her brief that her move to Naperville in 2007 and her alleged mental impairments were possible excuses for not seeking the free medical care available to her, and thus her significant failure to have sought medical care as undercutting her claimed illnesses and their severity should be ignored. But Ms. Orienti never testified to any of this, and her brief carefully ignores that she also had access to free or low-cost care in DuPage County. (R.45). She also had no difficulty seeking medical care in Wheaton, Illinois as recently as two months before her hearing. She even testified that she allegedly could attend therapy sessions there once a week. She offered no testimony at her hearing about any difficulties receiving care or medication due to economic, psychiatric, or travel related reasons and in fact testified that she regularly took her medicine.

The ALJ fulfilled his duty to probe into possible barriers to care where the evidence reveals a plaintiff's failures to seek care in the face of claimed significant illness or symptoms. But it must be recalled that a plaintiff's lawyer also has a responsibility to develop his client's case and thus to explore possible reasons why the client did not seek medical care in the face of claimed illness when common sense and human experience would have expected a person in distress to have done so. A claimant's lawyer cannot remain mute and then fault the ALJ. Since the applicant and her lawyer know those reasons better than anyone, a social security claimant bears the burden of supplying evidence to prove his claim of disability, *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir.2006); *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir.2004), and an ALJ is "entitled to assume" that an applicant represented by an attorney is making his "strongest case for benefits." *Glenn v.*

*Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir.1987). *See also Wall v. Astrue,* 561 F.3d 1048, 1063 (10th Cir.2009).

**6.**

Ms. Orienti further contends that it was improper for the ALJ to consider the fact that she continued smoking during her alleged disability period as evidence of her lack of credibility regarding her claimed breathing issues. She points to *Shramek v. Apfel*, where an ALJ erred by classifying smoking as non-compliance with her treatment. 226 F.3d 809, 812-13 (7th Cir. 2000). In this case, however, the ALJ referred to the fact that Ms. Orienti *lied* about when she quit smoking in her hearing testimony, *not the fact that she was still smoking*. In fact, the ALJ credited her COPD impairment in part because of her long history of smoking. (R. 69)

In *McClesky*, supra, the court suggested the misleading statements as to when the plaintiff stopped abusing drugs may have been given a bit too much weight because the claimant was testifying as to her use of crack cocaine, where an admission may have withheld because of fear of indictment. Still, the court felt the misleading statements were relevant. In this case, cigarette smoking is legal and the same interest against criminal self-incrimination is not present. The only reason Ms. Orienti had to lie was a concern that her continued smoking would necessarily reflected poorly on her credibility.

**7.**

Ms. Orienti also claims that the ALJ mischaracterized evidence that she was not using her inhaler for the six month period before her consultative medical examination. The record shows that at the examination, Ms. Orienti stated that she had not "received any Ventolin for the past six months." (R. 276). Without any explanation of the reasons for Ms. Orienti to be without her

medication, the ALJ made a reasonable inference that her condition was "essentially untreated." (R. 69). He made this assertion not in her credibility determination, as Ms. Orienti asserts, but in his RFC discussion, and he brought it up only to say that he was ignoring this finding by adopting the medical expert's recommendations for environmental limitations in Ms. Orienti's RFC. If this was error, it was one that benefitted the plaintiff, and she has no cause for complaint.

**8.**

The ALJ found that Ms. Orienti had the severe impairments of asthma/COPD and viral hepatitis. Ms. Orienti specifically alleges that the ALJ failed to explain his conclusion that her COPD was a severe condition but did not warrant an exertional limitation. In his discussion of his RFC determination the ALJ alluded to each of the three hospital visits contained in the record, as well as Ms. Orienti's consultative exam. In February 2006, she had an emergency room visit where she exhibited symptoms of bronchitis but left before being seen. In March 2006 she was examined and was found to have symptoms of wheezing and acute bronchitis. She did not return for a follow up appointment as she said she would. In August 2007 she again went to the emergency room with breathing difficulties but failed to follow up with her primary care physician. (*See supra* at 3-4).

At her April 2007 consultative exam, she exhibited some wheezing and coughing but, as the ALJ specifically noted, the medical record revealed that "[t]here was no increase in the A/P diameter, her thorax was normal in contour and not deformed, chest expansion was equal bilaterally, she had normal resonance and percussion, and air entry was good with no rales or rhonchi." (R. 68). According to the medical expert, and mentioned in the ALJ's decision, these results were "pretty normal." (R. 48, 68). In his decision, the ALJ echoed the medical expert's finding that the degree of medical care and treatment did not support a finding of disability. The ALJ also emphasized the

similar diagnoses of "not disabled" in the state requested medical evaluation and RFC assessment. Both determinations were in accord with the medical expert and other findings in the decision.

Since she cannot win on the evidence in the record that clearly supports the ALJ's RFC determination with respect to her COPD, Ms. Orienti also objects to the ALJ's refusal to order another PFT after she failed to meet American Thoracic Society testing criteria on her first one. Ms. Orienti blatantly mischaracterizes this report in her brief, claiming the doctor said she had used "her best efforts." (Pl. Brief at 12). He said nothing of the kind. She argues that since the first test was deemed invalid, the ALJ had a duty to make sure that there was a full record that adequately represented her condition. Ignored is the critical fact that the ALJ found that the October 2008 test was invalid due to "poor effort" by Ms. Orienti. (R. 70). He reasoned that since the first test was only two months prior to the hearing, there was no reason to believe that subsequent testing would yield more helpful results.

Again, the prior test was deemed not valid because there was "not full cooperation [from Ms. Orienti] in performing the forced vital capacities." (R. 48). This medical testimony provides a sufficient basis for the ALJ's judgment that the invalid test results were a product of Ms. Orienti's failure to perform at her fullest and that another test would not provide any more detailed results the second time around, since the motivation to obstruct the test had not changed. "[T]he need for additional tests or examinations will normally involve a question of judgment, and we generally defer to the ALJ's determination whether the record before her has been adequately developed." *Wilcox v. Astrue*, 492 Fed.Appx. at 678. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d at 246.

Additionally, the ALJ had other evidence concerning the extent of Ms. Orienti's COPD. He outlined other examinations and testing results that show largely normal lung function as well a thin record of medical treatment. Without more assurance that a second PFT less than two months after the previous test would elicit more cooperation or more complete results, Ms. Orienti's call for more testing is based only on "conjecture or speculation."

Alternatively, Ms. Orienti's failure to cooperate fully in the test is comparable to a scenario where she did not show up for the test at all. An ALJ only has to schedule a follow-up consultative examination when a claimant has "good cause" for not showing up to a first consultative exam. 20 C.F.R. § 404.1518. Accordingly, the ALJ did not err by declining to order an additional PFT.

**9.**

Ms. Orienti contends that the ALJ erred by failing to adequately consider her alleged severe stomach pain. The passage to which Ms. Orienti objects is the ALJ's evaluation of her stomach pain and inability to keep any food down as a symptom of her hepatitis-C. Here the claim was the constant vomiting at every meal resulted from and proved the claimant's alleged gastrointestinal problems. The ALJ reasoned that since Ms. Orienti maintained a constant weight of between 180 and 190 pounds over a period of several years, her assertions about her vomiting at every meal and difficulty eating were unfounded. The logic is unexceptional: "if the presence of objective indicators [here, weight loss] thus makes a claim more plausible, their absence makes it less so." *Parker v. Astrue,* 597 F.3d 920, 923 (7th Cir. 2010).

The plaintiff's rejoinder is that neither the medical expert nor any treating physician testified that weight loss would be a symptom of her stomach complications from her claimed hepatitis-C. But that was not the ALJ's point. His point rather was that she was obviously lying when she

claimed that she vomited every time she ate as a consequence of her gastrointestinal troubles since her weight remained constant over a period of years. Viewed most favorably to Ms. Orienti, that testimony was not credible. It is perhaps more accurate to call the testimony "incredible," and incredible testimony need not be believed. *Compare United States v. Hajda*, 135 F.3d 439, 444-445 (7th Cir. 1998).

Ms. Orienti asserts that her treatment record showed medically determinable conditions (gastroesophogeal reflux disease (GERD), dyspepsia, and hepatitis-c) that could have caused her abdominal pain. According to her, the ALJ erred in his evaluation of her credibility by failing to adequately explain the reasoning behind his decision and by making improper judgments about her condition without a proper medical background. It is impermissible for an ALJ to "substitute his own judgment for that of the medical experts," *Turner v. Astrue*, 390 Fed.Appx. 581, 585 (7th Cir. 2010). Likewise, an ALJ may not "draw medical conclusions themselves about a claimant without relying on medical evidence." *Back v. Barnhart*, 63 Fed.Appx. 254, 259 (7th Cir. 2003).

However, when examining medical evidence and a claimant's testimony, an ALJ can "point[] out examples of the kinds of objective evidence one might expect to see if [the claimant] had the limitations he claimed." *Id.* And, ALJs can use a combination of "objective evidence and common sense" to evaluate whether alleged symptoms establish an inability to work. *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010). *See generally,* Richard Posner, How Judges Think (2008). [4] Both

_____

[4] Indeed, throughout the range of the law, common sense and human experience always have a role to play. *See Miller v. Alabama,* 132 S.Ct. 2455, 2464 (2012);. *Ryburn v. Huff*, 132 S.Ct. 987, 991 (2012);*United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir. 1992) (Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009); *United States v. Ayala,* 887 F.2d 62, 67 (5th Cir. 1989)(The inferences any fact finder is permitted to infer from the evidence in a particular case is governed by a rule of reason, and fact finders may properly "'use their common sense'" and "'evaluate the facts in light of their common knowledge of the natural (continued...)

common sense and human experience warrant the conclusion that separate medical evidence was not needed to reject testimony that one can vomit at every meal and maintain a weight of almost 190 pounds over a span of years.

It is idle to suggest that Ms. Orienti's claim in this regard should have no impact on the ALJ's credibility determination. Of course, merely because Ms. Orienti may have been untruthful about any one aspect of her testimony does not mean that everything else she said was not credible. And the ALJ was sensitive to the principle that a court is entitled to accept portions of a witness' testimony and reject others. *Kadia v. Gonzales,* 501 F.3d 817, 821 (7th Cir.2007); *Allen v. Chicago Transit Authority,* 317 F.3d 696, 703 (7th Cir. 2003). Which is exactly what he did.

In arguing that the ALJ's evaluation constituted reversible error, Ms. Orienti points to *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 2996), where an ALJ "improperly indulged his own lay view of depression for that of [the physician]." First, *Rohan* is inapposite because in that case the ALJ held his own lay interpretation of medical facts over the opinion of the claimant's regular psychiatrist. *Id.* Here, the ALJ's determination that Ms. Orienti's alleged symptoms were not credible is driven by common sense and human experience, to say nothing of the medical record. And simply insisting that the opposite is true, as Ms. Orienti's brief does, cannot change the facts or make the ALJ's credibility determination enfeeble when it is not.

At Ms. Orienti's hearing the medical expert testified that her blood albumen levels were normal, demonstrating that even if she did have viral hepatitis, it had not progressed to cirrhosis. Similarly, in her RFC examination, the examining physician reported that there was no medical

---

[4](...continued)
tendencies and inclinations of human beings.'"); Posner, How Judges Think, 116 (Harv. Univ. Press 2008).

evidence that Ms. Orienti had hepatitis-C. Even though he credited the viral hepatitis as a severe impairment, the ALJ noted that there was no medical evidence or testing to confirm the allegation, and, the ALJ properly emphasized, there was no evidence that she had ever been treated for hepatitis-C. While Ms. Orienti alludes to her *one treatment* for dyspepsia and GERD as another possible source of debilitating pain, such a claim, the ALJ properly concluded, fails given its lack of persistence and the lack of persistent treatment.

Ms. Orienti also claims that the ALJ failed to provide details to support his decision when discounting her allegations of pain. Reliance is placed on *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002), which merely requires ALJs to give specific reasons behind their interpretation of the evidence. That is precisely what the ALJ did here, explaining in detail Ms. Orienti's sparse treatment record, conflicting and inconsistent statements, the conflicts between her testimony and medical evidence, etc.

## 10.

Ms. Orienti contends that the ALJ erred by failing to analyze her knee and ankle pain in his RFC analysis. She points out that an ALJ must evaluate all of a claimant's impairments, even those that are not severe. 20 C.F.R. § 404.1545(a)(2). In fact, the ALJ analyzed her alleged knee and ankle pain in his step three analysis, where he did not find a medically determinable impairment.

In his decision, the ALJ relied on the results of Ms. Orienti's April 2007 consultative exam to evaluate her knee and ankle pain. At that exam, Dr. Hare conducted a variety of tests to determine Ms. Orienti's ability to move. Ms. Orienti exhibited a normal range of motion and had no problems completing the various exercises required in the examination. The ALJ listed these results, as well as Dr. Stevens' opinion that the results were consistent with a "normal examination," in his step

three analysis. (R. 67). Ms. Orienti herself did not even complain of any knee pain or mention any knee surgery at that exam. The ALJ also alluded to the lack of any radiographic evidence of any knee or ankle arthritis, the lack of any treatment for knee or ankle pain, and inconsistencies in Ms. Orienti's testimony about when she had undergone knee surgery.

The evidence outlined in the ALJ's decision is more than sufficient for the ALJ to have made a logical determination that the record did not support Ms. Orienti's claim of debilitating knee and ankle pain. In similar cases where a claimant did not seek treatment for an alleged impairment, such evidence was a basis to find insufficient the claim of an impairment. *See supra* at 22; *Sienkiewicz*, 409 F.3d at 804.

As she did with respect to her mental health and COPD claims, Ms. Orienti further argues that the record was insufficient to determine disability due to knee pain because the ALJ did not order x-rays of her knee. A case record is "insufficient when it does not contain all the information we need to make our determination or decision." 20 C.F.R. § 404.1520b. An ALJ has a duty "to develop a full and fair record," *Thomas v. Sullivan*, 933 F.2d 581, 585 (7th. 1991). However, "we generally defer to the ALJ's determination whether the record before her has been adequately developed. Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence indicating that further development is required." *Wilcox v. Astrue*, 492 Fed.Appx. 674 (7th Cir. 2012). Here, the ALJ had sufficient evidence to make a determination, and Ms. Orienti has failed to meet her burden to show that additional development is required.

Ms. Orienti's reliance on *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000), is misplaced. In that case, the claimant had radiological evidence to support his alleged disability, as well as a treating physician backing up his testimony, and the ALJ erred in failing to order updated x-rays to

gauge the development of Mr. Smith's proven arthritis. *Id.* at 437-38. Ms. Orienti has no such objective evidence to support further development of the record. "'Despite the inherent difficulty of evaluating testimony about pain, an administrative law judge will often have solid grounds for disbelieving a claimant who testifies that she has continuous, agonizing pain.'" *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). This is such a case. When the record does not substantiate a claimant's testimony about her pain, an ALJ is not required to develop the record further only to find more reasons to discount the testimony. *Wilcox*, 492 Fed.Appx. at 679.

## 11.

Ms. Orienti also argues that the ALJ failed to consider the effect of her obesity in combination with her other non-severe impairments in his RFC analysis. Her latest medical record shows that she weighed 184 pounds and was five-feet three-inches tall. (R. 299). This gives her a body mass index of 32.6, qualifying her as obese. She contends that the ALJ did not consider how obesity could have contributed to the COPD impairment that he found in step two of his analysis. But any error in failing to mention obesity is harmless if the claimant did not explain to the ALJ how her obesity aggravated her condition and rendered her disabled. *See Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir.2006); *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004). Ms. Orienti's "mere assertion that she is obese did not satisfy that burden." *Mueller v. Colvin*, 2013 WL 1701053, 3-4 (7th Cir.2013). [5]

---

[5]Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work. This point is obscured by the tendency of lawyers and some cases to describe obesity as an impairment, limitation, or disability. It is none of these things from the standpoint of the disability program. It can be the *cause* of a disability, but once its causal effect, if any, is determined, it drops out of the picture. *Gentle v. Barnhart,* 430 F.3d 865, 868 (7th Cir.2005).

She also claims that the ALJ failed to explore how her alleged knee and ankle pain and her depression might have been exacerbated by her obesity. Generally, an ALJ must consider only impairments alleged by a claimant or about which he receives evidence. 20 C.F.R. § 404.1512(a). Of course, if the evidence of "another relevant impairment that could contribute to the cumulative effect of [a claimant's] other impairments" is sufficient to alert the ALJ, he must consider that effect as a whole. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). In *Clifford*, the court noted the "numerous references in the record" to the claimant's weight problem from several different doctors. *Id.* Here, the only evidence of Ms. Orienti's obesity comes from the notations of her weight at her various medical appointments. The record does not reveal any mention of obesity as a source of concern to any doctor or as having any effect on the impairments she claimed. In fact, her consultative exam notes merely note that she has a "medium build." (R. 277). No doctor has ever commented on it or mentioned obesity as having a limiting effect on her health, her ability to work or to function in any way.

When the ALJ adopts the limitations recommended by doctors who were aware of the claimant's obesity, a failure to mention obesity in a decision does not constitute reversible error. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding that "although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions"). When the claimant does not specifically note how obesity impaired his or her ability to work beyond the limitations courts have also been inclined to find harmless error when an explicit discussion of obesity is lacking. *See Prochaska*, 454 F.3d at 736-37 (7th Cir. 2006) (that since the ALJ adopted the limitations suggested by reviewing physicians and the claimant failed to specify "how obesity further impaired his ability to work" any failure to explicitly consider obesity

was harmless error); *Mueller v. Astrue,* 860 F.Supp.2d 615, 638–39 (N.D.Ill.2012)(harmless error not to address obesity when the record supports RFC finding and claimant fails to specify how obesity further impaired ability to work).

At bottom, Ms. Orienti's arguments about her weight are basically no more than speculation, devoid of any explanation or substantiating proof. One example of her speculation is that her weight might increase her shortness of breath and therefore prevent her from lifting the required weights for work at high exertional levels. However, the ALJ adopted the limitations recommended by both Dr. Arjmand and Dr. Stevens, the medical expert at Ms. Orienti's hearing. Given that Dr. Arjmand physically examined Ms. Orienti, and Dr. Stevens reviewed her medical records, it is evident that both were aware of her weight and took her obesity into account when determining their recommendations. Thus, the ALJ was not required to explicitly outline – actually speculate – how obesity factored into his analysis of the severity of Ms. Orienti's COPD and her ability to work. *Prochaska*, 454 F.3d 731 at 736-37.

## 12.

Finally, since the ALJ made a valid determination that Ms. Orienti's alleged symptoms of depression and knee pain did not constitute medically determinable impairments, he was not required to consider how obesity could affect these conditions either. *See supra* Part 3-c. "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments." SSR 96-8p.

## CONCLUSION

Analyzing an ALJ's opinion is not a game of Gotcha in which a reviewing court  nitpicks an opinion looking for a way to reverse. And "[n]o principle of administrative law or common sense

requires [a court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989). The plaintiff's motion for reversal and remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** August 7, 2013